LOTTINGER, Judge.
This is a suit on a promissory note. We have previously denied a motion to dismiss this appeal. Plaintiff, Tri-City Finance Plan, Inc., brought this suit to collect on a $1,728.00 promissory note, plus interest and attorney fees. The defendant, Larry J. Barbier, answered and reconvened alleging no valuable consideration for the promissory note in question, fraud, and asked for “any penalties provided by law” and “for attorneys’ fees”. The Trial Court found judgment in favor of defendant on the main demand and dismissed the plaintiff’s suit, and further, awarded the defendant-plaintiff in reconvention $3,000.00 in damages on the reconventional demand. From this judgment, plaintiff has appealed.
The record points out that the promissory note sued on by the plaintiff, Tri-City Finance Plan, Inc., was dated May 6, 1965, and was in the principal amount of $1,728.-00. On May 3, 1965, the defendant-appel-lee, Larry J. Barbier, filed a bankruptcy proceeding under No. 14386 in the United States District Court for the Western District of Louisiana, and was discharged on July 12, 1965.
Mr. Barbier testified that subsequent to May 3, 1965, and at approximately 7:00 o’clock p. m. on the day in question, the Assistant Manager for the Tri-City Finance Plan, Inc., stopped by his house to speak with him. In answering a question as to what happened on the date he signed the note, Mr. Barbier testified as follows:
“A: Every Monday night, I wait for a phone call. I work seven on and seven off and I wait for my phone call for what time I have to catch my boat. I wait for my phone call. The reason I know what time it is, is I’m waiting on my phone call. The Assistant Manager comes to the house around seven o’clock at night and the Manager, Mr. Hebert, wants to talk to me about that note and declaring bankruptcy and I told him that I couldn’t go because I was waiting on my phone call to go to work. He kept on after me, kept on after me. He stayed at least thirty minutes, keep on after me, so finally I told my wife to wait for the phone call for me and I went on ahead with him. This was close to seven o’clock in the evening — at night, and when I went up there, Mr. Hebert and the Assistant Manager, the young fellow, they sit me in the back at the office. Now, they was closed, but he was waiting for me, he said, because this paper had to be filed before the next day, he said, because to keep his records straight or he’d get into some kind of trouble with the top manager. I told him that I was going off-shore and I’d be in in seven days and I’d see about it when I come in. He said it had to be done then — that’s why they was waiting *271 for me so late, because they were already closed. I told him I wouldn’t sign nothing without my lawyer seeing it. Mr. Hebert told me that the papers had been sent to the lawyer and he okayed them for me to sign. I wanted to get in touch with the lawyer and it was too late to get in touch with him and I was trying to hurry up and go back home to see about my phone call. I signed the paper, but I signed three papers. This was at seven o’clock, because I always wait for my phone call to go to work.
“Q: Now, Larry, for what reason did you sign this paper?
“A: He told me if I resigned the note, that I wouldn’t lose my furniture and I’d still have good credit. I could start over and have good credit with them and they would sit back and they wouldn’t bother me and they wouldn’t take my furniture and I’d still have my furniture and everything, where I’d keep on renting my house with the furniture in it and nobody could touch the furniture, because they had the mortgage on it and with them having the mortgage, they wouldn’t even show up in bankruptcy; they’d just sit back and I’d just keep my furniture; I wanted my furniture, so I’d told ’em I’d be willing to keep paying ’em after bankruptcy and I’d keep my furniture and everything. He said that the reason he knew that I could keep my furniture was because he’d seen ’em take these bankruptcy cases similar to this one before that they handled.
“Q: Now, did you keep your furniture, Larry ?
“A: No, sir, I didn’t keep anything.
“Q: Who picked up the furniture ?
“A: The Court.”
Mr. Barbier testified that he had a sixth grade education, and could read very little if any at all, but he could sign his name. It was further testified by the defendant that the note was not read to him, and that it was blank when he signed it. There is no question but that the signature appearing on the note in question is the defendant’s.
In presenting its case, the plaintiff placed on the stand, beside the defendant under cross, the supervisor of the finance company and a cashier-bookkeeper. In essence the supervisor testified that he did not have any personal contact with Mr. Barbier as to the loan and promissory note in question, and that all he really did was to approve this transaction. The cashier-bookkeeper testified that she saw the defendant sign the note, and that the note had been typed and filled in prior to the time that he signed it. The plaintiff did not call as a witness the individual who personally handled this transaction between the finance company and Mr. Barbier.
There is no doubt but that the plaintiff finance company did convince Mr. Barbier that if he signed the new promissory note, the note being sued upon, that his furniture would not be taken by the bankruptcy court. From the testimony of Mr. Barbier, we believe that this was the true reason why he signed the note, and his signing of this new promissory note was not based upon any moral obligation which may have existed between him and the finance company. The Trial Judge was not convinced that the consideration for this new note was based upon any moral obligation of the defendant, and neither are we. In his reasons for judgment, the Trial Judge most aptly expresses his opinion as to this when he stated:
“But this record shows beyond doubt that the new note and so-called Chattel Mortgage were executed as a deliberate fraudulent scheme to enable plaintiff to get a judgment against this uneducated defendant and then to badger him by garnishment proceedings, to collect debts due before and canceled by his discharge in bankruptcy.”
We believe the Trial Judge was correct in his opinion, and therefore we can find *272 no reason for setting this portion of his decision aside.
 The defendant and plaintiff in reconvention was awarded damages in the sum of $3,000.00. The Trial Judge awarded these damages under the authority of LSA-C.C. Arts. 1934(3) and 2315, and Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964). Nowhere in the record of this proceeding do we find any testimony or any evidence dealing with any damages sustained by Mr. Barbier. In Ballard v. National Indemnity Company of Omaha, Neb., supra, at page 67, the Court held:
“In the types of cases set out in Article 1934 the principle of law announced there becomes applicable only after the lower court finds liability on the part of the defendant and that plaintiff has proved by a preponderance of the evidence the nature and extent of his injury, for only then does it become necessary to assess the damages.” (emphasis added)
It is hornbook law that the plaintiff must prove his case before he can recover. In order to prove one’s case, it is necessary that a certain amount of evidence be presented to the Court. . Under the requirements as set forth in Ballard v. National Indemnity Company of Omaha, Neb., supra, and in light of the absence of any testimony as to damages, we must necessarily hold that the Trial Judge erred in awarding damages to the defendant and plaintiff in reconvention.
Therefore, for the above and foregoing reasons, the ruling of the Trial Court in dismissing plaintiff’s demand is affirmed, and the ruling of the Trial Court in awarding damages to the defendant and plaintiff in reconvention is amended so as to delete that portion of the judgment. All costs to be paid by plaintiff-appellant.
Judgment amended and affirmed.